[Cite as *In re M.A.*, 2021-Ohio-1078.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 20AP-345 |
| M.A., | : | (C.P.C. No. 15JU-13229) |
| [A.A., | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on March 31, 2021

**On brief**: *Bellinger & Donahue*, and *Kerry M. Donahue*, for appellant.

**On brief**: *Steven Thomas D. Potts*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BROWN, J.

{¶ 1} Appellant, A.A. ("mother"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion of appellee, Franklin County Children Services ("FCCS" or "agency"), for permanent custody of mother's child, M.A. For the reasons which follow, we affirm.

{¶ 2} M.A. was born on June 12, 2006. FCCS obtained emergency custody of M.A. on May 19, 2017, following an incident where mother found M.A. vaginally penetrating his six-year-old sister. FCCS filed a complaint alleging that M.A. was a dependent child and the trial court granted FCCS temporary custody of M.A. on May 23, 2017.

{¶ 3} On August 14, 2017, the case proceeded to trial on the dependency charge before a magistrate. Mother was present at the August 14, 2017 trial with her attorney and a Somali language interpreter. Mother did not contest the dependency charge. Following the August 14, 2017 hearing, the magistrate adjudicated M.A. dependent, ordered

temporary custody to FCCS, and adopted a case plan. The case plan provided that M.A. would complete a juvenile sex offender assessment and follow any recommendations for treatment and counseling. The case plan obligated mother to complete family counseling and visit M.A. on a regular basis.

{¶ 4} The agency initially placed M.A. in a foster home; however, M.A. was removed from the foster home due to unacceptable sexual behavior. On October 2, 2017, the agency placed M.A. at the Hittle House, a certified children's residential treatment center located in Columbus, Ohio. The agency placed M.A. at an emergency shelter care facility located in Columbus, Ohio on July 11, 2018, after M.A. was discharged from the Hittle House due to his lack of progress in treatment. On October 15, 2018, the agency placed M.A. at a residential treatment facility located in Indianapolis, Indiana. M.A. was diagnosed with Conduct Disorder, Post Traumatic Stress Disorder, Attention Deficit and Hyperactive Disorder, and Sexually Maladapted Behaviors during treatment. By October 2018, the agency lost contact with mother and did not have an address for her.

{¶ 5} The trial court granted FCCS an extension of the temporary custody order on May 24, 2018. FCCS filed a motion for permanent custody on October 16, 2018. The agency served mother with notice of the hearing on the motion by publication.

{¶ 6} Mother did not appear for the November 16, 2018 hearing on the motion for permanent custody before a magistrate. Mother's attorney was present at the hearing and informed the magistrate that mother was not contesting the motion for permanent custody. However, when mother's attorney began to cross-examine the child's guardian ad litem ("GAL"), the magistrate concluded that mother was contesting the motion for permanent custody. As such, the magistrate continued the matter for a contested trial. The magistrate also appointed an attorney to represent M.A.

{¶ 7} The trial court scheduled another hearing on the motion for permanent custody for April 23, 2019. As mother had resumed contact with the agency in early 2019, the agency served mother with notice of the April 23, 2019 hearing by personal service. Mother did not appear for the April 23, 2019 hearing, and mother's attorney again informed the magistrate that mother was not contesting the motion.

{¶ 8} The magistrate issued a decision on May 2, 2019 granting FCCS's motion for permanent custody. Mother filed an objection to the magistrate's decision asserting that the magistrate's decision was against the manifest weight of the evidence, that mother

received ineffective assistance of counsel, and several other grounds for objection. Mother also filed a motion for admission of additional evidence and/or motion for new trial.

{¶ 9} The court held a hearing on the motion for additional evidence/new trial on July 31, 2019. Mother appeared at the hearing with her attorney. Mother's attorney informed the court that mother appeared at the courthouse the day after the April 23, 2019 hearing, as she "was told * * * by the caseworker and also by other court personnel * * * that that was when she needed to appear." (July 31, 2019 Tr. at 3.) The trial court denied mother's motion for a new trial, concluding mother "mistakenly showing up the day after trial" did not constitute "grounds for a new trial." (Sept. 16, 2019 Decision & Jgmt. Entry at 2.)

{¶ 10} On November 18, 2019, the trial court held a hearing on mother's objections to the magistrate's decision. Mother appeared at the hearing with her attorney. Mother's attorney informed the court that mother began "speaking to [counsel] in Somali" as the hearing was about to begin, causing counsel to believe that "[p]art of the problem" in the case was "a language deficiency." (Nov. 18, 2019 Tr. at 2.)  The court continued the hearing.

{¶ 11} On January 13, 2020, the trial court resumed the hearing on mother's objections to the magistrate's decision. Mother appeared at the January 13, 2020 hearing with her attorney and a Somali language interpreter. Mother's attorney informed the court he believed he rendered ineffective assistance during the case because he should have known that mother needed an interpreter.

{¶ 12} On July 1, 2020, the trial court issued a decision and judgment entry overruling mother's objections to the magistrate's decision. The court adopted the magistrate's decision granting the agency's motion for permanent custody and divesting mother of her parental rights.

{¶ 13} Mother appeals, assigning the following two assignments of error for our review:

> [I.] THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.
>
> [II.] APPELLANT WAS DENIED DUE PROCESS AS SHE IS UNABLE TO COMMUNICATE AND UNDERSTAND THE ENGLISH LANGUAGE AND WAS NOT APPROPRIATELY PROVIDED AN INTERPRETER TO UNDERSTAND PROCEEDINGS AND INSTRUCTIONS FROM FCCS OR

PROVIDED A READABLE AND UNDERSTANDABLE CASE
PLAN.

{¶ 14} For ease of discussion, we address mother's second assignment of error first. Mother's second assignment of error asserts she was denied due process as she was not provided a case plan written in Somali or provided with a Somali language interpreter to assist her during case proceedings or communications with FCCS. Mother states she is from Somalia, speaks Somali, and is unable to understand and communicate in English.

{¶ 15} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6, citing *In re A.J.*, 10th Dist. No. 14AP-284, 2014-Ohio-5046, ¶ 18; *In re Murray*, 52 Ohio St.3d 155, 157 (1990). " 'Permanent termination of parental rights has been described as "the family law equivalent of the death penalty in a criminal case." Therefore, parents "must be afforded every procedural and substantive protection the law allows." ' " *In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 22, quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 16} "Due process includes a hearing upon adequate notice, assistance of counsel, and under most circumstances, the right to be present at the hearing." *In re J.Z.*, 10th Dist. No. 05AP-8, 2005-Ohio-3285, ¶ 9. *See State v. Pina*, 49 Ohio App.2d 394, 401 (2d Dist.1975) (observing, in a criminal case, that the "failure to ensure that non-English speaking defendants are given the same opportunity as others to be present, to speak in their defense and to understand what is taking place, in whatever language they possess, reaches constitutional proportions"). Ohio has "incorporated appropriate due process requirements in the statutes and rules governing juvenile adjudications and dispositions, which are reflected in the extensive and rather intricate statutory framework expressed in R.C. 2151.413 and 2151.414." *In re Thompson*, 10th Dist. No. 00AP-1358 (Apr. 26, 2001).

{¶ 17} Although mother asserted ten different grounds in her objection to the magistrate's decision, mother did not object on the ground that she was denied due process due to the lack of an interpreter or a case plan written in Somali. Pursuant to Juv.R. 40(D)(3)(b)(iv) and Civ.R. 53(D)(3)(b)(iv), except for a claim of plain error, a party forfeits appellate review of any issue not raised in their objection to the magistrate's decision. *Tucker v. Hines*, 10th Dist. No. 18AP-375, 2020-Ohio-1086, ¶ 6 (stating that a "party who

fails to timely object to a magistrate's decision is limited by operation of Juv.R. 40(D)(3)(b)(iv) to claims of plain error on appeal"); *Trombley v. Trombley*, 9th Dist. No. 17CA0012-M, 2018-Ohio-1880, ¶ 10 (stating that "an appellant forfeits appellate review of any issues not stated in her objections to the magistrate's decision"). *See also* Juv.R. 40(D)(3)(b)(ii) and Civ.R. 53(D)(3)(b)(ii) (providing that an "objection to a magistrate's decision shall be specific and state with particularity all grounds for objection").

{¶ 18} In a civil proceeding, plain error is limited to "those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material, adverse effect on the character of and public confidence in, judicial proceedings." *In re Moore*, 10th Dist. No. 04AP-299, 2005-Ohio-747, ¶ 8, citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997). "Notice of plain error is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Tucker* at ¶ 7, citing *State v. Phillips*, 74 Ohio St.3d 72, 83 (1995).

{¶ 19} R.C. 2311.14(A)(1) and Sup.R. 88 set forth the circumstances under which the appointment of a foreign language interpreter is mandated. R.C. 2311.14(A)(1) provides that "[w]henever because of a hearing, speech, or other impairment a party to or witness in a legal proceeding cannot readily understand or communicate, the court shall appoint a qualified interpreter to assist such person." Sup.R. 88 provides, in relevant part, as follows:

> (A) When appointment of a foreign language interpreter is required.
>
> A court shall appoint a foreign language interpreter in a case or court function in either of the following situations:
>
> (1) A party or witness who is limited English proficient or non-English speaking requests a foreign language interpreter and the court determines the services of the interpreter are necessary for the meaningful participation of the party or witness;
>
> (2) Absent a request from a party or witness for a foreign language interpreter, the court concludes the party or witness is limited English proficient or non-English speaking and determines the services of the interpreter are necessary for the meaningful participation of the party or witness.

{¶ 20} The decision regarding whether a party or witness is "entitled to a court-appointed language interpreter is based on the trial court's assessment of the defendant's apparent ability to comprehend and communicate in the English language." *State v. G.C.*, 10th Dist. No. 15AP-536, 2016-Ohio-717, ¶ 17, citing *State v. Castro*, 2d Dist. No. 14398 (Sept. 20, 1995). "An imperfect grasp of the English language may be sufficient as long as the [party or witness] has the ability to understand and communicate in English." *Id.*, citing *Castro*. "The decision to appoint an interpreter is within the trial court's sound discretion." *Luna-Corona v. Esquivel-Parrales*, 12th Dist. No. CA2008-07-175, 2009-Ohio-2628, ¶ 11, citing *State v. Marquez*, 11th Dist. No. 2007-A-0085, 2008-Ohio-5324, ¶ 30.

{¶ 21} In *G.C.*, the defendant, a native of Bangladesh, India, argued that the trial court erred by accepting his guilty plea without appointing an interpreter to assist him during the plea hearing. The defendant did not ask the court to appoint an interpreter at the plea hearing, and the transcript of the plea hearing revealed that the trial court "personally addressed [the defendant] and [he] responded appropriately in English to all of the court's inquiries." *Id.* at ¶ 22. As such, this court found no support for defendant's "post-hearing claim that he [was] not English proficient" and in need of an interpreter at the plea hearing. *Id. See also Luna-Corona* at ¶ 34 (concluding that the record "did not demonstrate that [the appellant] was unable to understand and communicate in English, as the record indicate[d] that [the appellant] responded to all questions directed to him" by the magistrate at the hearing on a petition for a civil protection order); *State v. Flores*, 10th Dist. No. 19AP-405, 2020-Ohio-593, ¶ 14 (finding no support for the appellant's contention that "he was not English proficient and in need of the services of an interpreter," as the appellant "responded appropriately to the trial court's inquiries at the plea hearing"); *State v. Blankenship*, 77 Ohio App.3d 324, 331 (10th Dist.1991); *State v. Lopez*, 8th Dist. No. 90240, 2008-Ohio-3534, ¶ 11; *Castro*.

{¶ 22} Our review of the record in the present case demonstrates that mother was able to understand and communicate in English. At the beginning of the August 14, 2017 dependency hearing, the magistrate asked the Somali language interpreter to state mother's name. Both mother and the interpreter responded to the magistrate's question. The magistrate then personally addressed mother, inquiring as follows:

Magistrate Holben: [Mother], your Attorney tells me that you're willing to proceed uncontested today and have this Court find [M.A.] to be a dependent minor. Is that correct?

[Mother]: Yes, Your Honor.

Magistrate Holben: By telling me that, you're telling me you do understand you're giving up your right to trial, so you are giving up your right for the Prosecutor to prove the allegations in the complaint.

[Mother]: Yes.

Magistrate Holben: And the Court can issue custody orders and other orders on the family to address reunification through a case plan.

[Mother]: Yes.

Magistrate Holben: Does mother have any questions about that?

[Mother]: No, Your Honor.

Magistrate Holben: Okay. Has anybody threatened you or promised you to proceed uncontested today?

[Mother]: No one forced me.

Magistrate Holben: Are you under the influence of any drugs or alcohol that would impact your decision today?

[Mother]: No.

(Aug. 14, 2017 Tr. at 4-5.)

{¶ 23} The magistrate asked mother's attorney if mother was "in agreement with the case plan," and counsel responded "[y]es." (Aug. 14, 2017 Tr. at 11.) The magistrate then asked mother if there was anything else she wished to say, and mother responded "[n]o." (Aug. 14, 2017 Tr. at 11.) The magistrate indicated she would schedule the interim review hearing on the case for December 13, 2017, and asked was "December 13th okay for mother?" Mother responded "[y]es." (Aug. 14, 2017 Tr. at 12.) The magistrate further asked "[a]nd the annual review, May 21, 2018[?]" Mother responded "[t]hat's okay." (Aug. 14, 2017 Tr. at 12.)

{¶ 24} The agency's periodic administrative reviews of the case demonstrate that mother was communicating with the agency in English. For instance, in a May 18, 2018 review the agency stated "[m]other has reported that [M.A.'s sister] completed assessment/counseling at Children's Hospital," and that mother "reportedly plans to start attending visits consistently, as well as parent support groups." (May 18, 2018 Semiannual Administrative Review ("SAR") at 2.) In an October 15, 2018 review, the agency noted that mother had not contacted M.A. in the past 90 days and that "[mother] report[ed] that she is busy with work and her other children." (Oct. 15, 2018 Case Review at 5.) In an April 19, 2019 review, the agency stated that mother "report[ed] that her job and having younger children at home presents as a barrier for her to see [M.A.]," as mother reported "she works Monday through Friday" and did "not have childcare and [did] not drive and that [made] it difficult to go see [M.A.]." (Apr. 19, 2019 SAR at 2-3.)  There is nothing in the case reviews documenting a perceived inability to communicate with mother due to a language barrier.

{¶ 25} Mother asserts on appeal that she did "not understand case plans" or "her participation expectations" under the case plan due to her alleged language barrier. (Appellant's Brief at 11.) However, at the dependency hearing, mother informed the magistrate that she understood the court could issue a case plan to address reunification and she did not have any questions about the case plan. The transcript from the dependency hearing demonstrates that mother, not the interpreter, responded to the magistrate's questions appropriately in English. *Compare State v. Kami*, 5th Dist. No. 19 CAC12 0065, 2020-Ohio-5110, ¶ 24 (observing that, at the plea colloquy, "the interpreter, not appellant, responded to the trial court's questions"). Mother also initially began to comply with her case plan obligation to visit M.A. Mother visited M.A. "five times at the agency" while M.A. was in foster care and visited M.A. "two times" at the Hittle House. (Nov. 16, 2018 Tr. at 13.) Although mother later did not visit with M.A. for one year, mother's early visits demonstrate that mother understood she was supposed to visit M.A. Mother's statements to the agency documented in the case reviews demonstrate that mother stopped visiting M.A. due to her work schedule, lack of childcare, and lack of transportation. Such statements demonstrate that mother understood her case plan obligation to visit M.A., and mother chose not to visit  M.A. for reasons unrelated to an alleged language barrier.

{¶ 26} Mother appeared for the December 13, 2017 interim review hearing with her attorney; an interpreter was not present at the hearing. Mother did not appear for the

May 21, 2018 annual review hearing or the November 16, 2018 or April 23, 2019 hearings on the motion for permanent custody. Although mother did not appear at the hearings on the motion for permanent custody, mother was properly served with notice of both hearings and was represented by counsel at the hearings. *See In re Coffman*, 10th Dist. No. 99AP-1376 (Sept. 7, 2000), citing *In re Greene*, 10th Dist. No. 92AP-288 (Nov. 17, 1992) (concluding that, although mother was not present at the hearing on the motion for permanent custody, mother "was represented by counsel throughout the custody proceedings, which, coupled with notice, satisfied her due process right to a hearing"). Neither mother nor her attorney indicated to the magistrate at the December 13, 2017, May 21, 2018, November 16, 2018 or April 23, 2019 hearings that mother needed an interpreter or a case plan written in Somali.

{¶ 27} After the magistrate granted the agency's motion for permanent custody, mother and her attorney began to indicate to the court that mother would like an interpreter. At the July 31, 2019 hearing on mother's motion for additional evidence/new trial, the trial judge asked mother if she needed an interpreter, and mother responded "[y]es." (July 31, 2019 Tr. at 3.) Mother's attorney informed the court that he "had been conversing" with mother, but "guess[ed] [he] should have asked that question." (July 31, 2019 Tr. at 4.) When mother's attorney informed the court that mother had moved to New York for a period of time during the case, mother told the court "I never go [sic] New York." (July 31, 2019 Tr. at 15.)

{¶ 28} At the November 18, 2019 hearing on mother's objections to the magistrate's decision, mother's attorney informed the court that he believed mother had a "language deficiency." (Nov. 18, 2019 Tr. at 2.) The court asked counsel how he had been communicating with his client, and counsel told the court that mother spoke "enough English that [counsel] thought that [he] did not need an interpreter, but to - - this morning it became woefully clear that [mother] does." (Nov. 18, 2019 Tr. at 3.) The court indicated it would continue the hearing and told counsel it was his obligation "to go over and get an interpreter" for his client if she needed one. (Nov. 18, 2019 Tr. at 11.) When the court asked for mother's address, the following exchange occurred:

> [Mother]: Address?
>
> Attorney Rowland: What is your address?

[Mother]: 1954

Attorney Rowland: 1964 (sic) –

[Mother]: No, 54.

Attorney Rowland: 54

[Mother]: Oakland Park.

Attorney Rowland: Oakland Park, okay.

[Mother]: Apartment A.

Attorney Rowland: Zip?

[Mother]: 43224.

(Nov. 18, 2019 Tr. at 9-10.)

{¶ 29} At the January 13, 2020 hearing on mother's objections, mother's attorney again informed the court that he "presumed mother had sufficient ability [to communicate in English] and when [counsel] spoke to [mother] from time to time, [he] felt she did." (Jan. 13, 2020 Tr. at 14.) Counsel told the court that it was only at "the last couple of court hearings" that it became "clear [to counsel] that [mother] did not understand what [counsel] was saying." (Jan. 13, 2020 Tr. at 14.) The agency attorney informed the court that "[a]t no time prior to the [permanent custody] trial * * * was it ever thought of by anyone interacting with mother whether that be mother's counsel, guardian ad litem, or couns - - or Children Services did we believe that she needed an interpreter." (Jan. 13, 2020 Tr. at 5.)

{¶ 30} While mother and her counsel indicated to the court at the hearings following the magistrate's May 2, 2019 decision that mother would like an interpreter, mother never moved the court for the mandatory appointment of an interpreter pursuant to R.C. 2311.14 and Sup.R. 88. Although an interpreter was present at the August 14, 2017 dependency hearing, there is nothing in the record demonstrating mother asked the court to appoint an interpreter for the dependency hearing. Thus, as mother never specifically asked the court to appoint an interpreter, the trial court never made a finding regarding mother's level of

English proficiency or whether an interpreter was necessary for mother's meaningful participation in the case.

{¶ 31} Mother's ability to respond to all of the magistrate's inquiries at the dependency hearing and mother's communications with the agency documented in the case reviews demonstrate mother's ability to comprehend and communicate in English. Accordingly, in the absence of a specific request for an interpreter, the record fails to demonstrate grounds which would have caused the court to independently conclude that mother was not English proficient and the services of an interpreter were necessary for mother's meaningful participation in the case. Mother's desire for an interpreter at the hearings following the magistrate's decision does not demonstrate an interpreter was necessary for mother's participation at earlier periods in the case. *Compare G.C.* at ¶ 32 (concluding that, although defense counsel retained an interpreter for the sentencing hearing and the court approved defendant's request for reimbursement of the interpreter's fees, such facts could not reasonably be "construed as a finding that the appointment of an interpreter for the plea hearing was mandatory"); *State v. Abdugheneima*, 6th Dist. No. L-17-1013, 2017-Ohio-8423, ¶ 22 (rejecting the defendant's "contention that because the trial court granted his request for a translator at sentencing, it was incumbent on it to do so for trial"). Moreover, mother's statements at the hearings following the magistrate's decision continued to demonstrate mother's ability to comprehend and communicate in English, as mother was able to correct misstatements from her attorney. Mother's attorney's statements at the hearings demonstrate that counsel perceived no language barrier during his communications with mother throughout the first two years the case was pending.

{¶ 32} Accordingly, as the record demonstrates mother possessed the ability to comprehend and communicate in English, mother fails to demonstrate the lack of an interpreter or a case plan written in Somali deprived her of due process. As such, mother fails to establish that the present case presents the exceptional circumstances necessary to establish plain error.

{¶ 33} Mother's second assignment of error is overruled.

{¶ 34} Mother's first assignment of error asserts her trial attorney rendered ineffective assistance of counsel. Mother contends her attorney was ineffective by failing to communicate with her through an interpreter and by proceeding uncontested on the motion for permanent custody.

{¶ 35} R.C. 2151.352, as well as constitutional guarantees of due process and equal protection, guarantee parents the right to counsel at all stages of a permanent custody proceeding. *In re J.J.*, 10th Dist. No. 06AP-495, 2006-Ohio-6151, ¶ 28, citing *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6 (1980). The right to counsel includes the right to the effective assistance of counsel. *Id.*, citing *In re Heston*, 129 Ohio App.3d 825, 827 (1st Dist.1998). The two-part test for ineffective assistance of counsel used in criminal cases, announced in *Strickland v. Washington*, 466 U.S. 668 (1984), is "equally applicable in actions by the state to force the permanent, involuntary termination of parental rights." *In re S.G.*, 10th Dist. No. 10AP-442, 2010-Ohio-5722, ¶ 18, citing *In re S.B.*, 183 Ohio App.3d 300, 2009-Ohio-3619, ¶ 25.

{¶ 36} To establish ineffective assistance of counsel under the *Strickland* test, mother must demonstrate that: (1) counsel's performance was so deficient that he or she was not functioning as the counsel guaranteed under the Sixth Amendment to the United States Constitution, and (2) counsel's errors prejudiced mother, depriving her of a trial whose result is reliable. *Strickland* at 687; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. The failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other. *Strickland* at 697.

{¶ 37} Mother may establish deficient performance by identifying "acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland* at 690. "Judicial scrutiny of counsel's performance must be highly deferential * * * [and a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689; *Bradley* at 141. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Carter*, 72 Ohio St.3d 545 (1995). To show prejudice resulting from counsel's deficient performance, mother " 'must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.' " *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 42, quoting *Bradley* at paragraph three of syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 82, citing *Strickland* at 694.

{¶ 38} Mother asserts that, because counsel did not speak to her through an interpreter, she did not understand the case proceedings, her obligations under the case

plan, or the dates she was to appear for hearings. However, our analysis of mother's second assignment of error demonstrates that mother possessed the ability to comprehend and communicate in English and that mother understood her obligations under the case plan. *Compare State v. Oluoch*, 10th Dist. No. 07AP-45, 2007-Ohio-5560, ¶ 42 (rejecting the appellant's "contention that his counsel rendered ineffective assistance for failing to obtain an interpreter during appellant's plea hearing" as the "record established that no language barrier precluded appellant from understanding what transpired during the plea hearing").

{¶ 39} Furthermore, there is nothing in the record depicting the conversations between mother and counsel regarding the case proceedings, the case plan, or the hearing dates. When proof outside the record is " 'necessary to support an ineffective assistance claim * * * it is not appropriate for consideration on direct appeal.' " *State v. Phipps*, 10th Dist. No. 13AP-640, 2014-Ohio-2905, ¶ 69, quoting *State v. Zupancic*, 9th Dist. No. 12CA0065, 2013-Ohio-3072, ¶ 4. Accordingly, the record does not support mother's contention that her counsel rendered ineffective assistance by failing to speak to her through an interpreter.

{¶ 40} Mother further contends her attorney rendered deficient performance by proceeding uncontested on the motion for permanent custody. However, even if we were to presume counsel rendered deficient performance as mother suggests, mother fails to establish a reasonable probability that the outcome of the trial would have differed had her attorney contested the motion. The trial court concluded that "due to the overwhelming amount of evidence via testimony heard at trial," mother's objection asserting ineffective assistance of counsel lacked merit. (Decision & Entry Denying Mother's Obj. at 7-8.) The trial court determined the manifest weight of the evidence supported the magistrate's decision to grant FCCS's motion for permanent custody.

{¶ 41} R.C. 2151.414 governs the termination of parental rights in Ohio. *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42. Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child to grant permanent custody of the child to the agency, and (2) one of the situations set forth in R.C. 2151.414(B)(1)(a) through (e) applies. Clear and convincing evidence is more than a mere preponderance of the evidence; it concerns that "measure or degree of proof which 'will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to

be established.' " *K.H.* at ¶ 42, quoting *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus. A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28.

{¶ 42} The trial court adopted the magistrate's finding that clear and convincing evidence established the circumstances described in R.C. 2151.414(B)(1)(d). R.C. 2151.414(B)(1)(d) describes the situation where the child "has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period." *See also* R.C. 2151.413(D)(1) (obligating the agency to file a motion requesting permanent custody when a child has been in agency custody for 12 or more months of a consecutive 22-month period, unless certain exceptions apply); *In re J.P.*, 10th Dist. No. 18AP-834, 2019-Ohio-1619, ¶ 21. Mother does not dispute that the trial court correctly found M.A. was in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period.

{¶ 43} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, the court must then determine whether a grant of permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). R.C. 2151.414(D)(1) provides that, in determining the best interest of the child, the court must consider all relevant factors, including but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child, (b) the wishes of the child, as expressed directly by the child or through the child's GAL, with due regard for the maturity of the child, (c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, and (e) whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶ 44} The trial court concluded that the R.C. 2151.414(D)(1)(a) best-interest factor, regarding M.A.'s interactions and interrelationships with significant people in his life, weighed heavily in favor of granting FCCS permanent custody. The court observed that

mother rarely visited M.A. throughout the case and mother had no "contact whatsoever with child despite having had the opportunity to do so from April 2018 to April 2019." (Decision & Entry Denying Mother's Obj. at 3.) Regarding M.A.'s relationship with his siblings, the court noted the reason the case opened, and found nothing "to indicate that mom ha[d] implemented a safety plan for the younger child if [M.A.] was to return home." (Decision & Entry Denying Mother's Obj. at 3.) The record supports the court's findings. *See In re K.R.,* 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 82, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 59 (noting that "[c]ourts have considered the consistency of a party's visitation with a child when resolving the R.C. 2151.414(D)(1)(a) factor").

{¶ 45} The FCCS caseworker testified that, although mother visited M.A. a few times early in the case, mother did not have any contact with M.A. from April 2018 to April 2019. Evidence demonstrated that mother's failure to visit M.A. "negatively impact[ed]" M.A. and caused him to "regress[]" in treatment. (Oct. 15, 2018 Case Review at 1.) Mother asserts that she was "castigated for non-visitation but the residential treatment facility, that the child was placed in was [on] the far side of Indiana." (Appellant's Brief at 9.) However, M.A. did not move to the Indiana facility until October 2018, and was at placement located in Columbus, Ohio until that time. Mother had visitation scheduled for every Friday at 2:00 p.m. when M.A. was at the Hittle House in Columbus, Ohio, but visited M.A. only twice during his nine-month placement at the Hittle House. The agency "tried providing cabs and gas cards to [mother] to facilitate visits." (Oct. 15, 2018 Case Review at 5.) However, when the agency "scheduled cab services to pick [mother] up" for visits with M.A., mother "would send the cab away." (Apr. 23, 2019 Tr. at 17.)

{¶ 46} M.A.'s case plan specified that he would remain in agency care "until a counselor deems it is appropriate for him to be reunified with his family." (Case Plan at 8.) There is nothing in the record indicating that a counselor found it appropriate for M.A. to reunite with his family. The caseworker explained at the April 23, 2019 hearing that, as M.A. had not completed his treatment, returning M.A. to mother's home "would be a risk for his sister." (Apr. 23, 2019 Tr. at 18.) Thus, mother's sporadic early visits with M.A. and her failure to visit M.A. for one year, coupled with the ongoing safety concern for M.A.'s sibling, allowed the court to weigh the R.C. 2151.414(D)(1)(a) factor heavily in favor of granting FCCS permanent custody.

{¶ 47} Regarding the R.C. 2151.414(D)(1)(b) best-interest factor, concerning the wishes of the child, the court noted that M.A. wished to be reunited with his mother. The court appropriately weighed the R.C. 2151.414(D)(1)(b) factor against the other factors present in the case. *See In re D.B.*, 2d Dist. No. 2005-CA-33, 2006-Ohio-479, ¶ 42 (noting that "[w]hile [the wishes of the child] is one of many factors under R.C. 2151.414(D), it is not controlling"). Regarding the R.C. 2151.414(D)(1)(c) factor, concerning the custodial history of the child and whether the child has been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period, the court concluded that M.A. had been in the uninterrupted custody of FCCS since the case opened, a period in excess of 12 months. Accordingly, the R.C. 2151.414(D)(1)(c) best-interest factor weighed in favor of granting FCCS permanent custody.

{¶ 48} The R.C. 2151.414(D)(1)(d) best-interest factor addresses the child's need for legally secure placement and whether such placement can be achieved without a grant of permanent custody to the agency. The trial court observed that mother did not complete her case plan objectives, had no contact with M.A. from April 2018 to April 2019, and M.A. had not completed his treatment. The trial court noted that the caseworker testified M.A. was in need of legally secure placement. The record supports the court's findings.

{¶ 49} The caseworker testified that mother "did not complete any family counseling sessions with [M.A.]" and last visited M.A. "in April of 2018." (Apr. 23, 2019 Tr. at 11.) Although mother began to have phone contact with M.A. in April 2019, the caseworker stated that mother had no contact whatsoever with M.A. from April 2018 to April 2019. The caseworker explained that M.A. was discharged from the Hittle House "for lack of ability to complete treatment," and that M.A. was "about 50 percent through his completion rate" of his treatment at the Indiana facility at the time of the April 23, 2019 hearing. (Apr. 23, 2019 Tr. at 14.) In light of M.A.'s ongoing treatment needs, the caseworker stated that placing M.A. back in mother's home "may cause him more additional trauma and harm as well." (Apr. 23, 2019 Tr. at 21.) The caseworker testified that M.A. was in need of legally secure placement in order to complete his treatment and obtain permanency.

{¶ 50} Considering mother's failure to comply with her case plan objectives, M.A.'s treatment needs, and the caseworker's testimony, the record supports the finding that M.A. was in need of legally secure placement and that such placement could not be achieved without a grant of permanent custody to the agency. *See In re Brofford*, 83 Ohio App.3d

869, 878 (10th Dist.1992) (concluding that "[n]oncompliance with the case plan is a ground for termination of parental rights"); *In re Bailey*, 11th Dist. No. 2001-G-2340 (July 20, 2001). Accordingly, the R.C. 2151.414(D)(1)(d) best-interest factor weighed in favor of granting FCCS permanent custody.

{¶ 51} The R.C. 2151.414(D)(1)(e) best-interest factor asks whether any of the factors in R.C. 2151.414(E)(7) through (11) apply to the parents and child. The court found R.C. 2151.414(E)(10) applicable to the case, which describes the situation where the "parent has abandoned the child." R.C. 2151.011(C) provides that "[f]or purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." This court has "taken the position that the question whether a parent intended to relinquish parental rights is irrelevant to a determination of abandonment for purposes of R.C. 2151.414(E)(10)," as R.C. 2151.011(C) defines abandonment " 'solely in terms of the time between contacts.' " *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 44, quoting *In re D.P.*, 10th Dist. No. 06AP-780, 2007-Ohio-1703, ¶ 7. The court found that mother did not have any contact with M.A. from April 2018 to April 2019, a period in excess of 90 days.

{¶ 52} Mother contends she did not abandon M.A. because M.A. was placed at a facility located in Indiana "that mother had no easy access to." (Appellant's Brief at 11.) However, as mother ceased contact with M.A. in April 2018, mother had abandoned M.A., pursuant to R.C. 2151.011(C), before M.A. moved to the Indiana facility in October 2018. Mother further contends that she did not abandon M.A. because "phone calls and other methods of potential interaction were denied." (Appellant's Brief at 11.) While the record indicates the Indiana facility began denying mother phone contact with M.A. after the magistrate's May 2, 2019 decision, there is nothing in the record indicating mother was denied phone contact with M.A. from April 2018 to April 2019. As the record supports the trial court's conclusion that mother abandoned M.A., the R.C. 2151.414(D)(1)(e) best-interest factor weighed in favor of granting FCCS permanent custody.

{¶ 53} The record demonstrates the trial court properly reviewed and weighed the evidence pertaining to the best-interest factors. Upon a thorough consideration of the record, we find clear and convincing evidence exists to support the trial court's determination that an award of permanent custody was in M.A.'s best interest.

{¶ 54} Mother asserts that, if her attorney had contested the motion for permanent custody, "the hearing would have been scheduled at a later date and time in front of [the trial court judge] and counsel would have had time to reach out to, notify and prepare his client for the contested hearing." (Appellant's Brief at 14.) However, mother fails to explain how her presence at the hearing alone would have altered the outcome of the trial. Mother does not identify any evidence she would have presented or arguments she would have made at a contested hearing on the motion for permanent custody. In light of the evidence in the record, mother fails to establish a reasonable probability that the outcome of the trial would have differed had her attorney contested the motion for permanent custody.

{¶ 55} Based on the foregoing, mother's first assignment of error is overruled.

{¶ 56} Having overruled mother's two assignments of error, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

LUPER SCHUSTER and BROGAN, JJ., concur.

BROGAN, J., retired, formerly of the Second Appellate District, Assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).

_____