[Cite as *Migliara v. Migliara*, 2022-Ohio-2111.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| ROBERT MIGLIARA, | : | APPEAL NO. C-210413 |
| | | TRIAL NO. DR-1901297 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| ELIZABETH MIGLIARA, | : | |
| Defendant-Appellant. | : | |

Appeal From: Hamilton County Court of Common Pleas, Domestic Relations
Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 22, 2022

*Stagnaro Hannigan Koop Co., L.P.A,* and *Michaela M. Stagnaro*, for Plaintiff-
Appellee,

*Rodriguez & Porter, Ltd.,* and *Paul W. Shonk*, for Defendant-Appellant.

**CROUSE, Judge.**

**{¶1}** Defendant-appellant Elizabeth Migliara has appealed the trial court's judgment granting legal custody of the parties' only child to plaintiff-appellee Robert Migliara. In four assignments of error, Elizabeth argues: (1) the trial court erred in failing to appoint a Spanish-language interpreter to assist her during her court-ordered psychological examinations; (2) the trial court committed plain error by finding that her mental health was an adverse factor in the custody decision; (3) the trial court violated her due-process rights by forcing her to speak for herself when she was represented by counsel, and then by failing to probe her counsel's reasons for withdrawal; and (4) the trial court's cumulative errors deprived her of a fair trial.

**{¶2}** For the reasons discussed below, we overrule the assignments of error and affirm the trial court's judgment.

### *Factual Background*

**{¶3}** Robert filed for divorce from Elizabeth in July 2019. In December 2020, a trial was held before a magistrate. Elizabeth appeared pro se at the trial. The only two witnesses to testify were Robert and Elizabeth.

**{¶4}** Robert testified regarding Elizabeth's anger, temper, and mistrust. He testified that Elizabeth had accused him of seeing his ex-wife and would facetime him at work to check on him. He testified that Elizabeth placed tracking devices in his car, tore up and threw away his clothes, and broke his computers and electronic equipment. He claimed that sometimes, when she didn't want him to leave the house, she hid his laptop and clothes. Robert testified that one day, when the child was approximately four months old, he left the house despite Elizabeth telling him not to leave because she wanted to go jogging. When he returned, the door was locked,

Elizabeth was gone, and the child was home alone. Robert testified that Elizabeth had left the child at home while she went jogging and locked herself out of the house.

{¶5} Robert testified that Elizabeth called the police on August 18, 2018, because he was preparing to head out of town with the child and Elizabeth did not want them to go. They resolved the problem without charges being filed.

{¶6} Robert testified that the police became involved again on March 19, 2019. He testified that Elizabeth took his phone and refused to give it back. He testified that when he grabbed his phone, she punched and bit him. Robert called the police and Elizabeth was charged with domestic violence. Robert asked the prosecutor to dismiss the charge after he and Elizabeth drafted a "family harmony contract" and tried to work things out. Robert also filed for divorce, but later dismissed the case.

{¶7} Robert testified that he was concerned about Elizabeth's mental health. Thus, as part of the family-harmony contract, they agreed to complete marriage and individual counseling. Robert testified that they attended several marriage counseling sessions together. He testified that he attended his individual counseling sessions, but Elizabeth did not attend her individual sessions.

{¶8} Robert testified that a second domestic-violence incident occurred on June 27, 2019. He testified that he and Elizabeth got into an argument that day, and as he was walking down the stairs holding the child, Elizabeth punched him, kicked him, and tugged on his shirt to try to throw him off balance. Robert's shirt ripped and he ran toward the front door. He testified that as he was running out the door, Elizabeth tried to punch him or close the door on him, but ended up hitting the child. Robert went to the neighbor's house and called the police. Elizabeth was charged with domestic violence, but Robert asked the state to dismiss the charges.

{¶9} Robert submitted into evidence police reports and criminal complaints from both domestic-violence incidents. Regarding the March 19, 2019 incident, the police report stated that Robert's shirt was ripped and that he had redness in his left eye and a bite mark and bruising on his left forearm. The report noted that Elizabeth told officers that Robert put his arm around her neck, but there were no signs of redness on her neck. The June 27, 2019 report stated that Robert recorded audio of the altercation, and the recording supported his version of events. The report also stated that Robert had scratches and red marks on his neck and his shirt was torn and his chain was broken.

{¶10} On July 9, 2019, the court granted Robert's request for an ex parte civil protection order against Elizabeth. On October 17, 2019, Elizabeth signed a consent agreement for a civil protection order effective until October 15, 2020. Elizabeth agreed to supervised visits with the child, at first supervised at the Children's Home and later supervised by Robert. By the time of trial she had progressed to unsupervised visits.

{¶11} Regarding the parties' finances, Robert testified that he works for Kroger in data analytics. At the time of trial, he was still paying for Elizabeth's car insurance, health insurance, and cell phone, and was occasionally sending her money to help her with bills and other expenses.

{¶12} Elizabeth testified through an interpreter, but often mixed Spanish and English. The magistrate interrupted Elizabeth's testimony several times and told her to speak only Spanish. He said, "Your English is very good * * * but we have the Spanish interpreters here because of some of the legal language. So if you could remain in Spanish the entire time." Later during the trial, the court reiterated that Elizabeth's

English was "very good" and directed her to either speak all Spanish or all English, not to mix the two. Regardless, Elizabeth gave significant portions of her testimony in English.

{¶13} Regarding the March 19, 2019 argument, Elizabeth testified that she bit Robert because he put his arm on her neck and choked her. Regarding the June 27, 2019 incident, Elizabeth testified that Robert faked the injuries by scratching his own face with a comb. She testified that they had consulted a lawyer together about getting divorced and the lawyer told Robert that Elizabeth would get custody and he would have to pay child support unless he could find evidence that Elizabeth struggled with alcohol or domestic violence.

{¶14} Despite signing the consent agreement to the civil protection order, Elizabeth denied ever agreeing to the order. She testified that Robert lied about everything in an effort to avoid paying her child support, despite evidence that Robert had paid over $19,000 in support by the day of trial.

{¶15} Elizabeth testified that Robert does not take good care of the child, and that she called 241-KIDS on several occasions. The magistrate stated that exhibit six, a report from the child's doctor, "completely refute[d]" Elizabeth's allegations of neglect and Elizabeth admitted that 241-KIDS never substantiated any of her claims.

{¶16} Elizabeth testified that she works for Promerica as a recruiter and cleans houses on the side. She receives food stamps and received rent and cash assistance until November and December of 2019. She testified that she received her State Tested Nurse Aide ("STNA") certificate. Elizabeth testified that it was difficult for her to earn the certificate because the classes were taught in English. Elizabeth is from Peru and has a son who lives in Peru, but has lived in the United States since 2014.

{¶17} Robert requested that Elizabeth undergo a psychological evaluation. The court ordered Connor & Associates (psychologists Dr. Ed Connor and Dr. Sara Jones-Connor) to complete a custody-evaluation report, which included psychological evaluations of both parties. The evaluations included interviews, behavioral observations, and multiple assessments.

{¶18} The assessments required a sixth-grade reading level. Elizabeth completed a test in order to gauge her reading comprehension. Her "Word Reading Standard" score was equivalent to that of a junior in high school, and her "Sentence Comprehension Standard" score was equivalent to that of a fifth grader. The report stated, "However, Elizabeth was offered to have her translator translate any questions on each test that she could not comprehend and she accepted the offer and had her translator present."

{¶19} Elizabeth was administered the Millon Clinical Multiaxial Inventory ("MCMI") and the Spanish version of the Minnesota Multiphasic Personality Inventory ("MMPI"). Regarding the results of the MMPI, the report stated, "Elizabeth responded in a manner that reflects an effort to present herself in an extremely favorable light by denying many minor faults and shortcomings that most people acknowledge." The report further provided, "Elizabeth's defensiveness is so significant that it renders her profile invalid. Despite her high degree of defensiveness; however, there are indications of elevations on the 'overcontrolled hostility' scale, which suggests that Elizabeth can become impulsively aggressive at times."

{¶20} Elizabeth's results on the MCMI were similar. The results indicated that Elizabeth's responses were "somewhat guarded" and that she attempted to put forth a "perception of a more favorable persona than what actually may be the case." The

report stated that Elizabeth "may be adept at winning over the favor of others," but if an individual shows "waning interest in her, Elizabeth can become even more absorbed by and concerned with their continued commitment to her. If rejection becomes imminent, her energy and enthusiasm for the relationship can waiver from excited exuberance to edgy irritability and sometimes impulsive verbal aggression."

{¶21} The report detailed competing allegations of domestic violence by both parties. Robert claimed that he had called the police on seven occasions over 18 months due to domestic violence by Elizabeth. Elizabeth claimed that Robert had been violent toward her, but that she ended up going to jail because the police took Robert's side. She also told the evaluators that the arguments were always verbal and did not involve physical violence.

{¶22} Robert provided the evaluators with the audio recording of the June 27, 2019 incident, which the report stated, "appears to be authentic and concerning regarding Elizabeth's aggressive temper." Robert stated that Elizabeth has suggested that she could take the child to Peru, which has caused him to fear that she might abscond with the child and not return. Robert stated that he found Oxycodone pills in Elizabeth's car in an unlabeled bottle in October 2020. Elizabeth stated that she was prescribed Oxycontin in December 2019 and denied taking the pills for longer than she was prescribed. Robert claimed that Elizabeth was extremely jealous and suspicious. Elizabeth admitted that she was suspicious because Robert would surreptitiously meet with his ex-wife and he lost sexual interest in her.

{¶23} The evaluators interviewed Don Caylor, a neighbor of Robert and Elizabeth, over the phone. Caylor stated that he had never observed Elizabeth act

violently, but that he observed marks on Robert's body. Caylor said that Elizabeth could be somewhat verbally aggressive.

{¶24} The report noted concerns with Elizabeth's mental health and emotional stability. The evaluators did not determine a diagnosis or treatment plan, but required that Elizabeth "engage in psychotherapy with a Hispanic speaking therapist who can further assess any psychiatric condition." The evaluators recommended that Robert be given temporary sole custody of the child and Elizabeth be given supervised visitation until Elizabeth talked to a therapist and followed the treatment prescribed. The report recommended reassessment after six months and left the door open for joint custody and shared parenting as long as Elizabeth is "treatment compliant."

{¶25} The magistrate analyzed the factors in R.C. 3109.04(F)(1) before determining custody. The factors in R.C. 3109.04(F)(1)(a)-(c), (f), (g), and (i) were either inapplicable or neutral.

{¶26} Under R.C. 3109.04(F)(1)(d), the magistrate found, "Mr. Migliara reports that [the child] is happy with the current parenting schedule and is well adjusted to the schedule." Under subsection (e), he found, "The court is very concerned with the mental health of Ms. Migliara. She has been involved in therapy but only sporadically. She has had a psychological evaluation conducted by Dr. Ed Connor and the recommendation is that Ms. Migliara continue with psychotherapeutic intervention."

{¶27} Under subsection (h), the magistrate found, "There have been no criminal charges of domestic violence as it relates to either party relative to [the child being abused]. There was a domestic violence civil protection order granted to Mr.

Migliara with Ms. Migliara as Respondent. That protection order is no longer in effect." Finally, under subsection (j), the magistrate found, "It appears that both parties are planning to remain in Cincinnati. Ms. Migliara is from Peru and has family there so there is some concern that she may try to return to Peru with [the child]."

{¶28} The magistrate granted legal custody of the child to Robert and granted Elizabeth visitation. Regarding parenting time, the magistrate stated:

> Before the Court will consider overnight parenting time for Ms. Migliara she must undergo psychotherapy to address her aggressive temper and lack of emotional stability. Ms. Migliara should immediately engage in a [sic] properly licensed therapist (one that speaks Spanish would be ideal) after the journalization of this decision. After 6 months, Ms. Migliara may present her diagnosis and treatment to the Court in a Motion to establish an overnight parenting schedule.

{¶29} Elizabeth filed objections to the magistrate's decision, but did not specifically object to the magistrate's findings under the R.C. 3109.04(F)(1) factors. She did object on the basis that the magistrate was biased, and listed many examples of alleged bias. In one example, she argued that the magistrate was biased because he deferred to the custody-evaluation report and Robert's testimony when determining parenting time. Regarding that objection, the trial court stated, "The Magistrate gave proper weight and credibility to the evidence presented." The trial court overruled all of the objections, adopted the magistrate's decision, and issued a final judgment entry and decree of divorce.

***First Assignment of Error***

9

{¶30} In her first assignment of error, Elizabeth argues that the magistrate erred in failing to provide her with an interpreter during her interviews with Connor & Associates. Elizabeth contends that the trial court incorrectly interpreted Sup.R. 89(A), and the court's interpretation violated the Ohio Revised Code and her constitutional right to due process.

{¶31} Custody determinations are reviewed for an abuse of discretion. *Hatfield v. Hatfield*, 1st Dist. Hamilton No. C-210295, 2022-Ohio-737, ¶ 6. Also, "Whether a party or witness is entitled to an interpreter is initially based on the trial court's assessment of their apparent ability to comprehend and communicate in English." *State/City of Toledo v. Abdugheneima*, 6th Dist. Lucas No. L-17-1013, 2017-Ohio-8423, ¶ 12. "The decision is within the trial court's discretion, and the failure to appoint a translator is reviewed under an abuse-of-discretion standard." *Id.*

{¶32} However, a question of law, such as interpretation of a statute, is reviewed de novo. *Freedom Fund, LLC v. LVREIS, Inc.*, 1st Dist. Hamilton No. C-210356, 2022-Ohio-786, ¶ 26. Therefore, the proper standard of review of the trial court's interpretation of the Revised Code and Sup.R. 89 is de novo.

## I.     Due Process, R.C. 2311.14, and Sup.R. 89

{¶33} In criminal, juvenile adjudication, and parental-termination cases, parties have a constitutional right to an interpreter. *See In re M.A.,* 10th Dist. Franklin No. 20AP-345, 2021-Ohio-1078, ¶ 15-16. However, there is no constitutional right to free interpreter services in civil cases. *See Lopez v. Nevada Dept. of Corr.,* D.Nev. No. 3:17-cv-00732-RCJ-WGC, 2019 U.S. Dist. LEXIS 158747, *4 (Sep. 17, 2019).

{¶34} R.C. 2311.14(A)(1) provides, "Whenever because of a hearing, speech, or other impairment a party to or witness in a legal proceeding cannot readily understand

or communicate, the court shall appoint a qualified interpreter to assist such person." Black's Law Dictionary defines "legal proceeding" as "Any proceeding authorized by law and instituted in a court or tribunal to acquire a right or to enforce a remedy." *Black's Law Dictionary* 915 (8th Ed.2004). Therefore, the Revised Code does not directly provide for the appointment of an interpreter during a psychological evaluation.

{¶35} According to Sup.R. 89(A), "A court shall provide foreign language communication services to limited English proficient individuals in conjunction with *ancillary court services.*"

> "Ancillary court services" means any activity, other than a case or court function, that includes the exchange of legal or general court-related information with the public or parties in interest and *is paid for or provided by the court*. "Ancillary court services" includes, but is not limited to, the following: (1) Alternative dispute resolution programs; (2) *Evaluations*; (3) Information counters; (4) Probation or criminal diversion program functions; (5) Pro se clinics; (6) Specialized dockets and dedicated-subject-matter dockets.

(Emphasis added.) Sup.R. 80(A).

{¶36} The magistrate ordered Robert to pay for the evaluation because he requested it. The trial court held that Elizabeth's evaluation "was neither paid for nor provided by the Court. Therefore, it is not an ancillary court service for which the Court is required to provide an interpreter."

{¶37} We must presume that the Ohio Supreme Court's usage of "paid for or provided by the court" was intentional. If the Supreme Court wanted to provide for an interpreter whenever a court orders an evaluation, it could have said "ordered" instead

11

of "paid for or provided by the court." Therefore, Elizabeth was not entitled to a have an interpreter appointed for her psychological interviews.

## II. The evaluators and Elizabeth were able to communicate effectively during the interviews

**{¶38}** Where the record indicates that the parties and the court ultimately understood each other, instances of communication breakdowns and difficulties do not necessarily demonstrate that the court should have provided an interpreter. *See Abdugheneima*, 6th Dist. Lucas No. L-17-1013, 2017-Ohio-8423, at ¶ 13-21; *In re M.A.*, 10th Dist. Franklin No. 20AP-345, 2021-Ohio-1078, at ¶ 20 ("An imperfect grasp of the English language may be sufficient as long as the [party or witness] has the ability to understand and communicate in English.").

**{¶39}** A party's residency, work, and legal history may all be considered when determining whether the party needs an interpreter. *See State v. McNeill*, 2d Dist. Clark No. 2017-CA-64, 2018-Ohio-2659, ¶ 6.

**{¶40}** Elizabeth was interviewed three times. When needed, she used Google Translate during the first two interviews and paid for her own interpreter for the third interview. There was an interpreter present for the court hearings and the trial, but Elizabeth frequently spoke English.

**{¶41}** In the "Custody Recommendation and Treatment Recommendations" section of the custody-evaluation report, it was indicated that the evaluators had some difficulty communicating with Elizabeth. The report stated:

> As the Court can see, there certainly appear to be issues related to Elizabeth's mental health and emotional stability. It is difficult to ascertain with a reasonable degree of psychological certainty exactly what issues need to be psychiatrically addressed via psychotherapeutic or

psychopharmacological intervention given the language barriers. Although Elizabeth was quite adamant that she has no difficulty reading or comprehending the English language, her interviews suggest that there are significant challenges.

* * *

Elizabeth must first engage in psychotherapy with a Hispanic speaking therapist who can further assess any psychiatric condition that Elizabeth may have and how this condition can best be rectified via psychopharmacological and psychotherapeutic intervention.

**{¶42}** However, the majority of the report evinced effective communication between Elizabeth and the evaluators. The report described Elizabeth's answers to questions and her results on the various assessments. The evaluators never stated that they were unable to properly evaluate Elizabeth due to a language barrier. Although they did not reach any detailed conclusions regarding Elizabeth's mental health and emotional stability, it was not their job to diagnose her.

**{¶43}** Elizabeth has lived in the United States since 2014, earned a certificate as a STNA through a course taught in English, and at the time of trial worked as a recruiter for Promerica. Elizabeth also gave significant portions of her testimony in English.

**{¶44}** The fact that the magistrate believed an interpreter was necessary for court hearings and trial does not mean that one was necessary for the psychological interviews. A trial often involves legal language unfamiliar to the common person, and the magistrate was limited in the degree of assistance he could provide to Elizabeth. In a one-on-one psychological interview, the interviewer has more time to explain his

questions in simple terms and the ability to seek clarification to answers. Plus, as stated above, an interpreter was present for Elizabeth's reading comprehension test and she was administered the Spanish version of the MMPI.

{¶45} For these reasons, we conclude that the evaluators and Elizabeth were able to communicate effectively.

### III. Other evidence related to custody

{¶46} The trial court was very concerned with Elizabeth's mental health. The court found, "Dr. Connor's report was just one consideration regarding the best interests of the parties' minor child, not the basis for the custody determination."

{¶47} Other indicators of emotional instability besides the evaluators' interviews with Elizabeth included Robert's and Elizabeth's testimony, the police interventions, the audio recording of one of her alleged instances of domestic abuse, and Elizabeth's performance on the Spanish version of the MMPI. Therefore, even without considering the report, there was substantial evidence demonstrating that Elizabeth was dealing with some mental-health issues.

{¶48} For the foregoing reasons, the first assignment of error is overruled.

### *Second Assignment of Error*

{¶49} In her second assignment of error, Elizabeth argues that the magistrate erred by finding that her mental health was an adverse factor in the custody decision. She contends that the magistrate's concerns were based "almost entirely" on the custody-evaluation report, which she argues failed to meet the requirements of an expert opinion under Evid.R. 702 or the guidelines for custody evaluations under the Ohio Administrative Code.

**{¶50}** However, Elizabeth did not object to the admission of the report at trial and failed to raise any issues regarding its admission in her objections to the magistrate's decision. Therefore, she has waived the right to argue against its admission for the first time on appeal. *See U.S. Bank Natl. Assn. v. Broadnax*, 1st Dist. Hamilton No. C-180650, 2019-Ohio-5212, ¶ 13. The second assignment of error is overruled.

### Third Assignment of Error

**{¶51}** In her third assignment of error, Elizabeth contends that the trial court violated her rights to counsel and due process by forcing her to speak for herself while she was represented by counsel, and then by failing to probe her counsel's reasons for withdrawal after counsel made inflammatory, derogatory, and prejudicial comments about her.

**{¶52}** On June 22, 2020, the parties gathered for a hearing to discuss Robert's request that Elizabeth undergo a psychological evaluation and Elizabeth's counsel's request to withdraw from the case. Despite the presence of Elizabeth's counsel, the magistrate asked Elizabeth directly if she would be willing to undergo the evaluation. Elizabeth stated that she did not believe a psychological evaluation was necessary and told the court that she believed the evaluation was an attempt by Robert to harass her. Then the magistrate addressed the matter of Elizabeth's counsel's request to withdraw.

**{¶53}** Although generally an attorney speaks for her client, Elizabeth has not pointed to any authority that says the magistrate cannot directly question a party's willingness to undergo a psychological evaluation. Counsel's request to withdraw was pending, but had not been ruled upon. Therefore, counsel still represented Elizabeth at the time and could have interjected if she believed that the magistrate's line of

questioning was improper. The magistrate did not interfere with counsel's ability to respond on her client's behalf or force Elizabeth to speak for herself. Furthermore, the magistrate thoughtfully considered Elizabeth's objections and, indeed, agreed with Elizabeth's request that Robert also undergo a psychological evaluation. The magistrate did not violate Elizabeth's rights to counsel or due process.

{¶54} Next, Elizabeth argues that the magistrate failed to adequately investigate counsel's reasons for withdrawal.

{¶55} Elizabeth did not raise this argument in her objections to the magistrate's decision. Therefore, we review only for plain error. *See* Civ.R. 53(D)(3)(b)(iv); *In re $593 United States Currency Seized from Moore*, 1st Dist. Hamilton No. C-160601, 2017-Ohio-7330, ¶ 10.

{¶56} "The plain-error doctrine may be applied in appeals of civil cases 'only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.' " *Griffin v. Griffin*, 1st Dist. Hamilton No. C-180550, 2019-Ohio-5260, ¶ 28, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus.

{¶57} According to Prof.Con.R. 1.16(b), a lawyer may withdraw from representation of a client if any of the following apply:

(1) withdrawal can be accomplished without material adverse effect on the interests of the client; * * * (6) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; * * *.

16

{**¶58**} Counsel informed the court that Elizabeth had missed nine appointments between January 6 and March 12, 2020, and only called once to say that she could not make the appointment. Counsel stated that Elizabeth repeatedly disagreed with her regarding legal advice and case strategy and expressed distrust in her representation and advice. On "a few occasions" Elizabeth verbally abused counsel and another staff member at Legal Aid. Counsel contended that there was no chance for a productive attorney-client relationship.

{**¶59**} Elizabeth partially refuted counsel's allegations. She denied being verbally abusive and stated that she had simply given counsel her point of view. She agreed that she had missed three appointments, but argued that she missed one because of work and health reasons and the other two because she disagreed with a proposed settlement agreement.

{**¶60**} Counsel's statements demonstrated that her representation of Elizabeth had "been rendered unreasonably difficult" by Elizabeth's conduct, and Elizabeth has failed to demonstrate that counsel's withdrawal had a material adverse effect on her interests. *See* Prof.Con.R. 1.16(b). Because the magistrate did not commit plain error by granting counsel's request to withdraw, the third assignment of error is overruled.

### *Fourth Assignment of Error*

{**¶61**} In her fourth assignment of error, Elizabeth contends that the cumulative effect of the trial court's errors amounted to a denial of her right to a fair trial. Because we have overruled all of Elizabeth's individual assignments of error, her argument regarding cumulative error is without merit. The fourth assignment of error is overruled.

### *Conclusion*

{¶62}   All four assignments of error are overruled and the judgment of the trial court is affirmed.

Judgment affirmed.

**MYERS, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.